UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE MASSACHUSETTS
FOUNDATION FOR LEARNING
DISABILITIES, INC., operating as
THE WHITE OAK SCHOOL,

       Plaintiff,

v.                                                                Docket No. 15-CV-_____

B.U., M.U. and K.U., as Parents of
B.U., LONGMEADOW PUBLIC
SCHOOLS, and THE BUREAU OF
SPECIAL EDUCATION APPEALS,

       Defendants.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FROM DECISION OF
THE BUREAU OF SPECIAL EDUCATION APPEALS PURSUANT TO 20 U.S.C.
1415(i)(2)**

**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
REQUESTED PURSUANT TO FED.R.CIV.P. RULE 65(a) and (b)**

**PRELIMINARY STATEMENT**

The Plaintiff, the Massachusetts Foundation for Learning Disabilities, Inc.

operating as the White Oak School ("White Oak" or "the School") is a private, non-

profit, special education school for students with learning disabilities. It brings this

action seeking injunctive relief, or a stay, from a decision, issued August 21, 2015, of

the Bureau of Special Education Appeals ("BSEA") of the Massachusetts Department

of Elementary and Secondary Education. This decision, issued without a hearing or

taking of evidence, determined that White Oak is the "stay put" put placement (under

20 U.S.C. § 1415(j) of the Individuals with Disabilities Education Act ("IDEA")) for the

Defendant Student. The Defendant Student was terminated from the School under

state "emergency termination" provisions on April 30, 2015, after he threatened to

rape and stab a faculty member, threatened to rape, stab, shoot, and otherwise harm White Oak staff and students, and after several other incidents where he had made similar threats to a current White Oak student and a former White Oak student.

Following the Defendant Student's emergency termination from White Oak, the Defendant Parents and the Defendant Student filed an expedited hearing request with the BSEA on May 15, 2015 seeking, *inter alia*, an immediate order from the BSEA requiring White Oak to re-admit the student under the "stay put" provisions of the IDEA. A hearing was held on May 28, 2015, at which time it was agreed that the Defendant Student would not return to White Oak immediately, and that the Longmeadow School District would continue at home tutoring and arrange for an independent risk evaluation on the student's dangerousness, which evaluation would include interviews with White Oak staff and a visit to the campus. It was also agreed that an evidentiary hearing would be held on August 6 and 7, 2015 (a third day, August 14, 2015, was later added) on "stay put" and other issues raised in the expedited hearing request.

When the risk evaluator did not come to White Oak, and the Defendant Parents did not comply with discovery requests, White Oak filed a motion to continue the hearing, which motion was granted by the BSEA Hearing Officer. On August 21, 2015, in violation of BSEA rules and without any form of hearing, the BSEA Hearing Officer essentially decided the "stay put" case on the merits, determining that White Oak was the "stay put" placement, citing inaccurate facts, and even making findings "on information and belief."  She invited White Oak to request immediate relief in a new case in the event that the student's return to White Oak on **September 1, 2015** (when White Oak's fall semester starts) would be a threat to the health and safety of himself or others.

2

In this action, White Oak seeks immediate relief from the BSEA's decision in the form of a temporary restraining order, and seeks further relief from that decision in the form of a preliminary injunction, to prevent the student's return to the school on grounds that include: 1) that the student's return would pose a clear and imminent threat to the health and safety of the White Oak students and staff; 2) that the stay put provisions of the IDEA do not apply to private schools, which follow state regulations in terminating a student on an emergency basis; 3) that White Oak is not licensed or approved by state authorities to serve students such as B.U. who suffer from mental illness and have behavioral symptoms; and 4) that the BSEA denied White Oak the right to a fair hearing and procedural due process in violation of the IDEA and the United States Constitution.

## JURISDICTION

1.    This Court has jurisdiction pursuant to 20 U.S.C. 1415 (i)(2) and 42 U.S.C. § 1983.

## THE PARTIES

2.    The Plaintiff, White Oak School, incorporated as the Massachusetts Foundation for Learning Disabilities, is a private 501(c)(3) not for profit corporation established pursuant to G.L. ch. 180. White Oak's principal place of business is 533 North Road, Westfield, MA 01085.

3.    The Defendants, K.U. and M.U. are the mother and father of the student in this case, the Defendant B.U. The Defendants' last known address is 71 Lawrence Avenue, Longmeadow, MA 01106.

4.    The Defendant, Longmeadow Public Schools ("Longmeadow") is a public school district duly organized, established, and existing under the laws of the Commonwealth of Massachusetts.  Longmeadow's principal place of business is

535 Bliss Road, Longmeadow, MA. At all relevant times, the Defendant

Longmeadow is and was the Local Education Agency responsible for providing a

Free Appropriate Public Education for B.U. pursuant to the IDEA, under 20

U.S.C. 1400 *et seq.*

5. The Defendant, The Bureau of Special Education Appeals, is a government

agency with a principal place of business located at One Congress Street, 11th

Floor, Boston, MA. The BSEA is an agency of the Massachusetts Department of

Elementary and Secondary Education, and conducts administrative due

process hearings on disputed special education matters pursuant to 20 U.S.C.

1415(f).

**FACTUAL BACKGROUND**

**A.    White Oak**

6. White Oak, which has been in existence since 1990, serves approximately 60

students, all of whom have language-based learning disabilities. White Oak is

approved by the Department of Elementary and Secondary Education ("the

DESE") to contract with school districts to serve students with learning

disabilities. It is a tax-exempt organization pursuant to section 501(c)(3) of the

Internal Revenue Code.

7. The DESE has detailed regulations concerning private schools such as White

Oak, and the DESE has a division responsible for ensuring that private schools

comply with those regulations. The regulations for private schools are set forth

in 603 CMR 28.00 and 603 CMR 18.00.

8. White Oak is approved by the DESE only to serve students with learning

disabilities. White Oak is not approved to serve students with mental illness,

and who have behavioral problems that are associated with their mental illness.

It would be a violation of White Oak's approval from the DESE for the school to continue to serve B.U., who was diagnosed with a mental illness, "Harm" Obsessive Compulsive Disorder ("Harm OCD"), in the spring of 2015.

9.   Unlike other private schools in the Commonwealth, White Oak does not employ licensed mental health clinicians, counselors, or other mental health professionals. White Oak is not a "therapeutic school" that can provide services to special education students who have mental health needs that result in behavioral episodes.

10.   Many White Oak students have difficulties with self-esteem, some have a background with trauma, and could therefore suffer severe psychological harm if they were threatened with violence by another student. If White Oak were compelled to readmit B.U., there is a clear threat of irreparable harm.

**B.   B.U. and the incident of April 2, 2015.**

11.   B.U. is a seventeen-year-old adolescent with language-based learning disabilities, and a recent (spring 2015) mental health diagnosis of Harm OCD. B.U. enrolled at White Oak in 2009 as a special needs student whose tuition was paid for by Longmeadow.  He has completed his junior year. When he was a child, B.U. suffered a cerebral artery distribution stroke, which left him with a mild left hemiparesis and cognitive deficits. B.U. has experienced tics and seizures while at White Oak.

12.   Until the spring of this year, B.U. made good educational progress at White Oak. He and his parents were valued and respected members of the White Oak community. B.U. did not have any behavioral incidents, and was polite and respectful with his teachers.

13.  At some point in the spring, a male faculty member learned that B.U. had been diagnosed with OCD, and B.U. shared with that faculty member that he had experienced some disturbing thoughts and images. B.U. was calm during this conversation, and the faculty member was not concerned with what B.U. had told him.

14.  In the middle of March 2015, B.U. threatened to kill a female student who was annoying him in a classroom. B.U. had not previously engaged in this type of threatening behavior, and it was witnessed by another faculty member who did not believe at the time that the incident was serious. However, the female student was so frightened by the incident that she approached a female faculty member, Alexandra Sutter. The female student further requested that she be able to eat in Mrs. Sutter's office due to her fear of encountering B.U. in the cafeteria.  She stated to Mrs. Sutter that she did not feel safe in class with B.U. Mrs. Sutter relayed the incident to the teacher of the class in which the threats occurred, Cameron Rodak, who she believed would handle the situation appropriately.

15.  On April 2, 2015, B.U. asked Mrs. Sutter if she could assist him in preparing for an audition for a local theater company. She agreed, and the practice took place in a classroom at White Oak with no other person present. At the conclusion of the practice, he told her that he wanted to speak with her. As he began speaking, he moved close to Mrs. Sutter. His face was red, and he was clenching his fists as he spoke. He told Mrs. Sutter that he was "very angry" and could not control his feelings. His voice sounded low and he appeared angry. Mrs. Sutter said she was sorry he was feeling this way and asked what he was angry about.

16.   B.U. told Mrs. Sutter that he wanted to stab, shoot, rape, and harm people at White Oak. He was looking directly at Mrs. Sutter as he spoke. Mrs. Sutter asked if he had discussed these issues with his parents or a doctor. He said that his sexual feelings had taken control of him and that he was unable to control them. He indicated with a hand gesture that other people's sexual feelings were at a low level, and then raising his hand over his head, stated that this was where his sexual feelings were. He then repeated that he wanted to stab and rape people. He then looked at Mrs. Sutter and told her that it was Mrs. Sutter that he wanted to stab and rape, and that "he could not stop himself."

17.   Mrs. Sutter is a veteran teacher at White Oak, and previous to her employment at White Oak, taught students with significant behavioral issues in the East Bronx in New York City.

18.   At this point in the conversation, Mrs. Sutter became fearful that B.U., who is 6' 3", was about to attack her. She told B.U. that it was best if the conversation ended and she turned to exit the classroom. At this point, she could see B.U. coming quickly toward her. Mrs. Sutter was terrified.

19.   As B.U. came toward Mrs. Sutter, he fell to the ground and his body started to shake. He appeared to be having a seizure. Mrs. Sutter moved several chairs that were close to him and then ran to the nurse's office to obtain assistance for B.U. During the time that Mrs. Sutter was going to the nurse's office, approximately 30 feet away, she could hear that B.U. had screamed her name as he exited the classroom to the hallway and then went into the bathroom. Several students also heard this screaming and came out of their classrooms. A

male staff member and the nurse attended to B.U. in the bathroom as he
continued to scream Mrs. Sutter's name.

20.   Mrs. Sutter took detailed notes that day of what had occurred.

21.   After the incident, the School's executive director, David Drake, telephoned
K.U., B.U.'s mother, informed her of what had happened, and asked her to
come to the school. M.U., B.U.'s father, also came to the School because Mr.
Drake was concerned about K.U.'s safety if B.U. were to go home with her
alone.  M.U. informed Mr. Drake that B.U. had been diagnosed with OCD, and
that he would not act on his threats. M.U. also informed Mr. Drake that B.U.
had threatened a female former White Oak student, and that the parents of that
student had prohibited their daughter from being physically present with B.U.
He also told Mr. Drake that B.U. had threatened M.U. and K.U. M.U. then put
B.U.'s psychiatrist, Dr. Ronald Davidoff, on his mobile phone and handed the
phone to Mr. Drake. Dr. Davidoff confirmed B.U.'s OCD diagnosis.

22.   B.U. was taken home by his parents on April 2, 2015.

**C.    Events after April 2, 2015, and B.U.'s emergency termination from
White Oak.**

23.   Mr. Drake contacted Ms. Fontaine of Longmeadow in response to the incident of
April 2, 2015. In an email the following Monday, April 6, 2015, Mr. Drake wrote
to Ms. Fontaine to inquire about an "emergency meeting" on April 8, 2015.  This
meeting took place on April 8, 2015, and included B.U.'s therapist, who stated
that "he did not have reason to believe that [B.U.] would act on his thoughts,"
and also that B.U. suffered from obsessive thoughts about sex and rape, and
that he "had a need to tell." K.U. asked whether Longmeadow was considering a
"different placement." Ms. Fontaine took detailed notes.

24.   Longmeadow was considering another placement and sent K.U. and M.U. a
      release, which would allow Longmeadow to forward records to a nearby private
      day school for students with disabilities, the Valley West School ("Valley West").
      Valley West is a private school that serves students with mental health
      disorders and has a clinical staff that includes a clinical director, masters' level
      clinicians, and behavioral counselors. Valley West also offers a special
      education learning program for disabled students.

25.   White Oak has no clinical staff and does not offer the type of therapeutic
      services that B.U. now requires.

26.   K.U. and M.U. executed the release provided by Longmeadow for Valley West,
      but failed to follow through with the application process because they have
      insisted that B.U. return to White Oak. As of late July, Valley West had e-
      mailed Ms. Fontaine, continuing to express an interest in admitting B.U. as a
      student for this fall.

27.   Longmeadow does not support B.U. returning to White Oak for his senior year
      starting September 1, 2015.

28.   On April 29, 2015, a meeting was held at White Oak with Ms. Fontaine, David
      Drake, K.U. and M.U., and other White Oak staff, including Alexandra Sutter.
      K.U. and M.U. contended that B.U. had Harm OCD and would not act on his
      threats. White Oak was concerned not simply with whether B.U. would act on
      his threats, but whether his compulsion to share his violent, sexual, and
      disturbing thoughts with others, as had occurred on at least three occasions
      and was documented by his therapist, would pose an imminent risk to the
      health and safety of other White Oak students and staff. White Oak has an
      "open campus" and lacks the staffing to monitor interactions with students. If

B.U. were to threaten violence with a White Oak student, or engage in violence, the results could be psychologically and/or physically catastrophic.

29.  After the meeting with Ms. Fontaine, K.U., and M.U. on April 29, 2015, White Oak staff convened and decided that it would be unsafe and contrary to the health and safety of others to permit B.U. to return to White Oak.

30.  On April 30, 2015, Mr. Drake wrote to Ms. Fontaine stating that B.U. could not return to White Oak for the school year, given the "magnitude of his needs and our difficulty in responding effectively to them." He added that White Oak was mindful of "our significant obligation to provide education service to [B.U.] during this transition, and we will continue to provide instructional material until an alternative placement can be arranged."

31.  Ms. Fontaine responded to Mr. Drake's email as follows: "I do appreciate how difficult this decision was for you and your staff. Moving forward we will need work supplied until we can secure another placement for [B.U.]."

32.  B.U.'s termination was proper under DESE "emergency termination" regulations for private schools. The prospect of B.U. returning to White Oak and repeating his violent threats yet again, this time with a vulnerable White Oak student, were "circumstances which present a clear and present threat to the health and safety of others" and therefore constitute an emergency under 603 CMR 18.05(7)(d). As is made clear in both 603 CMR 18.05(7)(c)(distinguishing between a "planned" and "emergency" termination) and 603 CMR 28.09(12)(b), no Individualized Education Plan TEAM meeting was required before emergency termination absent a request for a two week stay from Longmeadow, which did not occur. Under the regulations, parents have no right to request a stay put at

White Oak because the continued enrollment of the student could pose a risk of harm to others.

33. The emergency termination regulations require that the School District be informed, and that the District "assume responsibility" for the student. 603 CMR 28.09(12)(b). Longmeadow had "assumed responsibility" by providing tutoring to B.U. and seeking an alternative placement. Longmeadow did not request a two week extension, as it was entitled to under the regulations.

34. White Oak has informed DESE of the emergency termination of B.U. DESE regulators have not cited White Oak for non-compliance or taken any action to demand that White Oak re-enroll B.U.

35. White Oak continued to provide assignments and work for B.U., and B.U. continued to receive tutoring from Longmeadow.  B.U. has received credit for his junior year.

36. Since the incident of April 2, 2015, B.U. has failed to receive appropriate care, which would reduce the chances that he would act on his threats or tell others about his violent, sexual, and disturbing thoughts.

37. OCD is a mental illness recognized under DSM V and is challenging to treat. B.U.'s Harm OCD could be disabling for him and traumatic for others if he is not provided with intense treatment from a specialist. Summaries produced from B.U.'s therapist show that, between May 28, 2015 and July 24, 2015, he has participated in five insight oriented therapy sessions and spent several weeks away on vacation in Ireland. He has reported to his therapist that he continues to have intrusive thoughts "that may affect his ability to have close relationship with others;" that he is uncomfortable around "girls in part because of his intrusive thoughts;" that he has a generalized feeling (allegedly

11

unrelated to his "violent/sexual thoughts and images") that "something bad was

going to happen;" and that he was "feeling down about what happened at White

Oak and the ways things unfolded." In a text communication he has referred to

White Oak as "a scumbag" (sic).

38.   Appropriate treatment to control B.U.'s compulsion to share his violent

thoughts with others, or to act upon them, would include "exposure therapy"

designed to teach B.U. to become habituated to his thoughts so that they no

longer frighten him and compel him to share them with others. In addition,

B.U. would benefit from intensive treatment with a specialist, not limited to 50

minute sessions, as they currently are with his therapist.

**D. The BSEA proceedings**

39.   On May 15, 2015, B.U., K.U., and M.U. filed an expedited hearing notice at the

BSEA. In their request for relief they sought, among other things, a

determination that White Oak had "deprived B.U.'s stay put (last agreed –upon)

placement" under the IDEA, resulting in a denial of FAPE. They also sought an

order "requiring the White Oak School to <u>immediately</u> re-enroll [B.U.] in school."

40.   The BSEA Hearing Officer scheduled a hearing for May 28, 2015, and the

parties arrived with witnesses prepared to testify, including B.U.'s therapist and

an expert retained by White Oak, Dr. Paul Zeizel.

41.   After consultation with the BSEA Hearing Officer and discussion among the

parties, it was determined that the case would not go forward and that B.U.

would continue to receive tutoring until the end of the school year. White Oak

agreed to provide assignments and grades for B.U.'s junior year. It was further

agreed that B.U. would receive a clinical risk assessment as well as various

other evaluations, and that if B.U. remaining at White Oak and "stay put"

continued to be a request for relief, the clinician conducting the risk assessment would conduct interviews with White Oak staff. The parties also agreed that August 6 and 7, 2015 would be set aside for an evidentiary hearing. (As set forth above, a third day, August 14, 2015 was later added.)

42.    The fact that the BSEA Hearing Officer did not simply conclude on May 28, 2015 that B.U.'s stay put placement was White Oak, which would (under the parents' position) mandate his immediate return to White Oak, was a recognition that there were significant issues concerning his potential threat to the health and safety of others at White Oak, that "stay put" is not necessarily "location specific" (meaning White Oak), and that there were issues as to whether stay put applied to private schools (as opposed to public schools) in light of court decisions holding that private schools are contractors for Local Education Agencies under IDEA and not required to provide a Free Appropriate Public Education.

43.    The scheduling of dates for evidentiary hearings was also a recognition that it would be necessary to take evidence to resolve the issues in the event that the Defendant Parents continued to press for B.U. to return to White Oak.

44.    Even prior to the May 28, 2015 hearing, White Oak had propounded discovery (starting on May 13, 2015) in the case, such as document requests, which included requests for electronically stored documents and communications concerning B.U., and medical records (an issue which the parties briefed to the BSEA) concerning his condition, so that these documents could be evaluated by White Oak and its expert. White Oak also sought an order in mid-May to have Dr. Zeizel evaluate B.U. (a motion which was ultimately denied by the BSEA Hearing Officer on August 21, 2015).

45.  The Defendant parents and student did not comply with their discovery obligations, and White Oak filed motions to compel. Indeed, the Defendant Parents and Student were producing responsive documents and e-mails as late as August 16, 2015, well past the June response date.

46.  In addition, White Oak made attempts to ensure that the risk assessment evaluator would come to White Oak and interview staff, as had been agreed at the May 28, 2015 hearing. When White Oak did not hear from the evaluator, it sent letters to the BSEA Hearing Officer on June 30 and July 10, 2015, requesting a conference to discuss the issue. The Hearing Officer (who had agreed at the May 28, 2015 hearing to hold conferences if requested by the parties) simply did not respond.

47.  In light of these issues, White Oak filed a motion on July 27, 2015 with the Hearing Officer to continue the three days of hearings that had been scheduled.

48.  On July 31, 2015, the BSEA Hearing Officer granted White Oak's request for a continuance in light of the outstanding discovery requests due from the Defendant Parents and Student, and the fact that the clinician performing the risk assessment had not, as agreed at the May 28, 2015 hearing, interviewed White Oak staff. The parties were instructed to inform the BSEA, no later than August 6, 2015, of the dates on which 1) a TEAM meeting would convene "to consider Dr. Rose's report or the most recent school-based evaluations of [B.U.] (some of which ha[d] not yet been completed as of July 30, 2015)"; 2) Dr. Rose would make a site visit to White Oak as previously agreed to by the parties; and 3) discovery would be completed. No new hearing dates were set.

49. On July 28, 2015, White Oak filed a motion to dismiss all claims of the Defendant Parents and Student relating to stay put or re-enrollment of B.U. at White Oak. On August 7, 2015, the Defendant Parents and Defendant Student filed a motion for a stay put order determining that White Oak was the stay put placement. White Oak filed an opposition to this motion asserting, among other contentions, that stay put was the very same issue that was before the BSEA on May 28, 2015, and that the issue could not be determined without the evidentiary hearing, including the results of the risk assessment and other evaluations that had been previously agreed to by all parties and the BSEA Hearing Officer. In addition, White Oak argued that the clinician performing the risk assessment had still not come to White Oak to interview staff, and that his understanding of the relevant facts had come exclusively from the student and his parents and were inaccurate.

50. BSEA Rule XII requires that there be a hearing on any decision in a case unless the parties agree that the BSEA can decide the matter on written materials.

51. On August 21, 2015, the BSEA sent the Hearing Officer's ruling (dated August 20, 2015) (hereinafter the "Decision") granting the Defendant Parents' and Student's motion for a stay put order, and determining that White Oak was the stay put placement. The four page ruling was the final decision on this issue, which was originally scheduled for an evidentiary hearing on May 28, 2015, and then continued to August 6, 7, and 14, 2015 for an evidentiary hearing. The evidentiary hearing was then further continued because of the failure of Longmeadow to arrange the clinician conducting the risk evaluation to include interviews with White Oak staff concerning their version of the events and issues, and the failure of the Defendant Parents and Student to comply with

discovery obligations. The Hearing Officer essentially rewarded the Defendant Parents and Student for discovery non-compliance, and punished White Oak for insisting that it receive the fair hearing to which it was entitled.

52.  While styled as a "ruling on a motion," which would not necessarily require a hearing, the Decision was the final ruling on the critical issue in the case: Whether White Oak was the stay put placement and had to re-enroll B.U. The Hearing Officer even resolved, without evidence, critical factual issues such as the events of April 2, 2015, which she inaccurately characterized as an incident where the student "confided intrusive and violent thoughts to one of his teachers." In its response to the Defendant Parents' and Student's Expedited Hearing Request, White Oak had set forth in detail the threatening words and actions that B.U. engaged in on April 2, 2015 as described above in Paragraphs 11 through 22.

53.  The Hearing Officer stated that B.U. was excluded from White Oak School after April 2, 2015, even though the evidence clearly shows that the Defendant Parents requested that B.U. remain out of School until April 26, 2015. The Hearing Officer even resorted to stating twice in the Decision that she believed certain facts to be true *"on information and belief"* (emphasis added).

54.  In conducting her analysis of the stay put issue, the Hearing Officer acknowledged BSEA rulings that have held that stay put may or may not be "school specific," and that the stay put requirement can be satisfied by a program that provides services "that are comparable to those in the former private placement." Factors in this analysis," she wrote, "are the availability of a comparable placement and the impact on the student of a change in the location of services."

55.     If the agreed upon evidentiary hearing had taken place, the Hearing Officer
        would have learned that Longmeadow had located a potential alternative
        placement for B.U. at Valley West, but the Defendant Parents had refused to
        follow through on the application process. There was therefore no basis for the
        Hearing Officer to conclude that White Oak was the only "stay put placement"
        since the facts showed otherwise.

56.     Likewise, the Hearing Officer took no note of B.U.'s new mental health
        diagnosis, or White Oak's contention that if the DESE senior supervisor (who
        had been subpoenaed and appeared at the May 28, 2015 hearing) had been
        permitted to testify, she would have likely testified that the continued
        enrollment of B.U. was contrary to White Oak's DESE approval status.

57.      The Hearing Officer concluded that her stay put decision "does not take into
        account issues of health or safety or of the appropriateness of White Oak for
        Student." She then stated: "A party seeking to change Student's placement on
        health or safety grounds may file an expedited hearing request at the BSEA or
        seek injunctive relief in a court of competent jurisdiction."

58.     The Hearing Officer failed to recognize established BSEA rules and decisions
        that private schools do not have standing to initiate expedited hearing requests
        at the BSEA. More significantly, however, the statement quoted in the previous
        paragraph did not recognize that the case the Hearing Officer had been
        presiding over since May 28, 2015 (where White Oak was a party only because
        it was brought in by the Defendant Parents) was supposed to address, after an
        evidentiary hearing, whether the student's re-enrollment at White Oak would
        constitute a threat to the health and safety of others.

59. No new evidentiary or other proceedings had taken place since May 28, 2015, when all of the parties and the Hearing Officer recognized that stay put at White Oak was premature given that neither a risk assessment nor an evidentiary hearing had taken place.

60. The Hearing Officer's Decision was arbitrary and capricious and denied White Oak the fair hearing to which it was entitled.

## IV. CAUSES OF ACTION

### COUNT I (20 U.S.C. § 1415(i)(2))

61. White Oak repeats and realleges Paragraphs 1 through 60 as if fully set forth herein.

62. White Oak was a party to the BSEA proceedings that were brought by the Defendant Parents and Student.

63. The BSEA has issued a Decision finding that White Oak is the "stay put" placement for B.U. Since disabled students are entitled under the IDEA to their "stay put" placement during the pendency of administrative and District Court appeals, White Oak is now facing the threat of irreparable harm to itself and its students if it is required to readmit B.U. for the fall semester, starting on September 1, 2015. If White Oak fails to re-enroll B.U., it risks violating the Decision of the BSEA. (Rule XIII(C) of the BSEA hearing rules requires that the Decision be implemented immediately). If White Oak re-enrolls B.U., its students and staff face a threat of irreparable harm because B.U.'s newly diagnosed mental illness – Harm OCD – causes him to engage in behavior that is a clear and imminent risk to the health and safety of White Oak students and staff.

64.   White Oak has an obligation to provide a safe environment for its students and staff. If B.U. were to re-enroll, it would be placing its students and staff at risk of physical or psychological harm.

65.   White Oak is not approved by the DESE to provide educational services to students such as B.U. with mental illnesses that result in serious behavioral episodes. White Oak risks a threat to its approval status from DESE if it is required to re-enroll B.U.

66.   White Oak was entitled to a fair and impartial hearing under the provisions of the IDEA and the BSEA hearing rules, including the right to call and cross-examine witnesses and to have factual findings made based upon evidence. White Oak was entitled to an evidentiary hearing under Rule XII of the BSEA hearing rules and the agreement of May 28, 2015. White Oak has been deprived of those rights by the Decision of the BSEA.

67.   White Oak is aggrieved by the Decision of the BSEA pursuant to 20 U.S.C. 1415(i)(2). In order to prevent the threat of irreparable harm, White Oak seeks a temporary restraining order enjoining enforcement of the BSEA's Decision finding that White Oak is the stay put placement for B.U., and a preliminary injunction containing the same relief or an immediate stay of the BSEA's Decision.

## COUNT II (42 U.S.C. § 1983)

68.   White Oak repeats and realleges Paragraphs 1 through 67 as if fully set forth herein.

69. White Oak was entitled to a fair and impartial hearing under the provisions of the IDEA and the BSEA hearing rules, including the right to call and cross-examine witnesses and to have factual findings made based upon evidence. White Oak was entitled to an evidentiary hearing under Rule XII of the BSEA hearing rules and the agreement of May 28, 2015. White Oak has been deprived of those rights by the Decision of the BSEA.

70. The BSEA has deprived White Oak of its right to procedural due process under the 14th Amendment of the United States Constitution.

71. The BSEA has deprived White Oak of rights secured by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.

**WHEREFORE,** White Oak requests that this Honorable Court:

1) Issue a temporary restraining order pursuant to Rule 65(b) of the Fed. R. Civ. P., enjoining enforcement of the BSEA Decision or, in the alternative, issue an immediate stay of the BSEA's Decision;

2) Hold an evidentiary hearing at the Court's earliest convenience pursuant to 20 U.S.C. 1415 (i)(2)(C)(ii);

3) Issue a preliminary injunction enjoining enforcement of the BSEA Decision or, in the alternative, continue the stay of the BSEA's Decision;

4) Issue a permanent injunction enjoining enforcement of the BSEA Decision;

5) Reverse the BSEA Decision;

6) Issue a declaratory judgment that stay put under 20 U.S.C. 1415 (j) does not apply to a private special education school in Massachusetts that terminates a student in accordance with DESE regulations on an emergency basis; and

7) Grant such other relief as this Court deems just and proper;

8) Award White Oak its costs of suit.

Respectfully submitted,
The White Oak School
By its attorneys,


/s/ Blakely E. Markham
Roderick MacLeish (311880)
Janine Brown-Smith (663900)
Blakely E. Markham (685165)
CLARK, HUNT, AHERN & EMBRY
150 Cambridgepark Dr.
Cambridge, MA  02140
(617) 494-1920
rmacleish@chelaw.com
jbrown-smith@chelaw.com
bmarkham@chelaw.com

August 24, 2015